## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
(Ft. Myers Division)

Case No.: _____

**WILLIAM HUESMAN**

      Plaintiff,

v.

**GOOGLE LLC,**

      Defendant.

_____/

## COMPLAINT

Plaintiff William Huesman hereby sues Defendant Google LLC.

## <u>INTRODUCTION</u>

1.     Plaintiff Bill Huesman was a highly talented and experienced senior executive at Google. Unfortunately, Mr. Huesman is White. His supervisor, Snehanshu Shaw, expressly told him that his future at Google was limited due to being White. Mr. Shah, a toxic employee who was regularly intoxicated (on and off the job) and who was the subject of numerous human resource complaints, repeatedly berated Huesman and interfered with his relationship with Google. Shah came close to being terminated at one point, but despite numerous complaints – including from a Google vendor, Deloitte – Shah remained employed while Huesman was undermined, marginalized and ultimately blacklisted. Google took no action to remedy the racially hostile

work environment, and given Shah's pronouncement that Huesman had no future at Google because of his race, Huesman reluctantly resigned.

## PARTIES

2.    Plaintiff William Huesman is a resident and citizen of Florida, and is currently domiciled in Collier County, Florida. Mr. Huesman is a former employee of Defendant Google LLC.  At all relevant times, Huesman was a resident of Collier County, Florida.

3.    Defendant Google LLC is a Delaware limited liability company with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## JURISDICTION & VENUE

4.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

5.    The Ft. Myers division of the Middle District of Florida is the appropriate venue under 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to Mr. Huesman's claims occurred here.

6.    All administrative prerequisites have been satisfied and/or waived.

//

## BACKGROUND

7.      In or around October 6, 2019, Mr. Huesman was hired as Google Cloud's Enterprise Sales Director by Rob Enslin, the President of Google Cloud.

8.      From Mr. Huesman's hire in October 2019 to Mr. Enslin's resignation in April 2022, Mr. Huesman largely enjoyed a cordial and professional work environment as Mr. Enslin did not discriminate against, harass, and/or retaliate against Mr. Huesman. Rather, Mr. Enslin provided Mr. Huesman with honest and glowing performance reviews which rightfully attributed Mr. Huesman's success to him.

9.      Prior to Mr. Enslin's resignation, Mr. Huesman discussed Snehanshu Shah, a Managing Director of Google, with him on multiple occasions. Mr. Huesman expressed to Mr. Enslin that he believed he was being harassed and targeted Mr. Shah because he was a White man. As a direct superior to Mr. Shah, Mr. Enlsin had personal experience with Mr. Shah's unprofessional behavior and warned Mr. Huesman to be careful of Mr. Shah.

10.      According to Mr. Enslin, Mr. Shah had a well-documented history of harassing employees while intoxicated at work and/or during work hours. Mr. Shah would also regularly fall asleep during meetings due to his excessive alcohol consumption, and at other times, act belligerently due to his intoxication. Despite having full knowledge of Mr. Shah's deplorable behavior

– Google has received more than twenty complaints against Mr. Shah during his employment – Google instructed its employees to just "deal with it" and never took action against Mr. Shah.

11.    Mr. Enslin was not the only witness to Mr. Shah's unprofessional conduct. Directors John Wesley Ostlund, Brian Mills, Doug Swan, and Andy Walker all witnessed Mr. Shah's belligerence.

12.    In addition to his intoxicated behaviors, Mr. Shah was known for making numerous discriminatory comments towards White employees, including Mr. Huesman. For example, Mr. Shah stated to Mr. Huesman, in front of others, that he did not want to have "rich, white guys who drive Mercedes and golf all day" at Google. Notably, Mr. Huesman does not play golf. Mr. Shah's discriminatory remark was clearly based on a derogatory stereotype of White people.

13.    Google itself only reinforced Mr. Shah's anti-White sentiment, as Mr. Huesman was informed by his direct supervisor, Mr. Mills, at a year-end performance review that he should not expect to receive any further promotions from Google because he is White.

14.    As explained below, Mr. Huesman submitted complaints to two of his superior directors, Jay Meissner, Head of Global Systems Integration Partners, and Chris Voss, a Director of North America GSI Partnerships. Mr. Huesman is aware that both Mr. Meissner and Mr. Voss have been demoted,

and Mr. Meissner have had complaints submitted against them. (Mr. Voss subsequently left Google).

## Mr. Shah Begins to Target Mr. Huesman

15.    Beginning in January 2022, Mr. Huesman's issues with Mr. Shah escalated. On or about January 20, 2022, a number of Google employees, including Mr. Huesman, attended a meeting with Deloitte Consulting LLP's management team to discuss upcoming projects. Deloitte is an important Google Cloud Partner and the two companies collaborate and work together on a regular basis.

16.    During the meeting, without any sort of provocation, Mr. Shah began to verbally attack and harass members of Deloitte's senior management. Mr. Huesman attempted to play peacemaker as an attempt to save Google's relationship with Deloitte, but the damage had already been done.

17.    Of course, this was not the first time Mr. Shah verbally assaulted Deloitte and its employees. It is not a secret among Google Cloud employees that Mr. Shah, along with Craig Cook, a Director of SAP at Google, hate working with Deloitte. Rather, Mr. Shah and Mr. Cook expressed in both internal and external correspondences and meetings that they do not enjoy working with Deloitte. It is due to their repeated behavior that Deloitte made numerous written and verbal requests to Google that Mr. Shah and Mr. Cook not only be disciplined by Google, but also that they be removed from any

interactions with Deloitte given their pattern and practice of harassment and unprofessional behavior. Despite these explicit requests, Google refused.

18.    After the call, Mr. Huesman was contacted by a number of senior Deloitte employees as they demanded an explanation from Mr. Huesman (who they trusted and respected), and further demanded that Mr. Shah be spoken to about his unprofessional behavior. These members included, but are not limited to, Karthik Amirtharajan (Deloitte's Cloud Transformation Leader and Enterprise Resource Planning on Google Cloud GTM), Rami Jumean (a Managing Director of Deloitte's SAP Cloud Technology), and Praveen Maylur (a Managing Director in the Cloud Engineering Practice). Mr. Huesman exerted his best efforts for damage control. Deloitte requested that Mr. Huesman take the lead on the relationship and to request that Google have Mr. Shah removed from the relationship with Deloitte.

19.    Mr. Shah must have heard of Mr. Huesman's conversation with Deloitte, as that night he called Mr. Huesman while intoxicated (again, it was not atypical for Mr. Shah to drunkenly call other Google employees). Mr. Shah, angered that a White man like Mr. Huesman attempted to undermine his authority, launched into drunken tirade asserting his authority over Mr. Huesman and expressly prohibited Mr. Huesman from taking certain actions, even if it was for the benefit of Google. Mr. Shah demanded that Mr. Huesman treat Deloitte in a hostile manner moving forward. Mr. Huesman refused to

take any action which would further damage Google's already strained relationship with Deloitte. Mr. Shah, growing increasingly incensed, threatened Mr. Huesman that if he did not fall in line with Mr. Shah's instructions, then he would "have his head." It was clear that Mr. Shah was discriminating against and harassing Mr. Huesman because of his race, as Mr. Huesman was merely attempting to decrease the damage that Mr. Shah inflicted upon Google's relationship with Deloitte.[1]

20.    Approximately a week later, on January 28, 2022, a number of senior Google employees (Andy Walker, and Mr. Huesman) met with members of Deloitte's management team (Mr. Amirtharajan, Mr. Jumean, and Kashif Rahamatullah [a principal in the Cloud Engineering practice of Deloitte] to figure out how to fix the now-poisoned relationship between Google and Deloitte as a result of Mr. Shah's unhinged actions. This was viewed by the members of the meeting as a "recovery meeting" to address the "political" disputes between Google and Deloitte and how to repair their relationship and move forward to increase profits for both companies. Overall, Deloitte demanded that Mr. Shah be removed from the relationship and that Mr. Walker and Mr. Huesman act as Google's primary contact with Deloitte.

---

[1]    Plaintiff reserves his right to sue Mr. Shah personally. *See Alexis v Ventura*, 66 So. 3d 986 (Fla. 3d DCA 2011).

21.     In furtherance of the January 28, 2022 meeting, Mr. Huesman and Mr. Walker requested to have a meeting with Alison Paul, the Managing Director of Deloitte Global Alliance at Google to report Mr. Shah and to discuss the plan between Deloitte and Google for further growth in their business relationship. This was a strategic request and the individuals were carefully selected. Ms. Paul was the former Vice Chairman and US Retail Leader of Deloitte for approximately nineteen years. Mr. Walker also previously worked at Deloitte and was considered a trusted advisor by both sides. Mr. Huesman, respected on both sides, had no connections with Deloitte but was viewed by Deloitte as being the individual most suited to lead further discussions.

22.     Ms. Paul invited Rakesh Kumar to attend the meeting as well. At the meeting, Mr. Huesman and Mr. Walker informed Ms. Paul of Mr. Shah's unprofessional behavior on January 20, 2022, and how it had negatively impacted the relationship between Google and Deloitte. Moreover, Mr. Walker and Mr. Huesman informed Ms. Paul of the subsequent meetings that had to be arranged by Google and Deloitte to address Mr. Shah's behavior, as well as Deloitte's list of demands, including that Mr. Shah be removed from the relationship. Mr. Huesman also informed Ms. Paul of the aggressive and harassing call that he received from Mr. Shah while Mr. Shah was clearly intoxicated.

23.     Ms. Paul confirmed that she received prior reports of Mr. Shah (and had first-hand knowledge of his behavior and discriminatory nature), that she had received calls from Deloitte complaining about him, and that she would file a complaint against Mr. Shah. However, even though Ms. Paul made a representation that she would file a complaint against Mr. Shah on two occasions, she never did so. It is believed that Ms. Paul did not do so because Mr. Shah holds considerable authority at Google and that Ms. Paul was afraid of being subjected to retaliation by Mr. Shah.

24.     After the meeting, a summary of Mr. Huesman and Mr. Walker's meeting with Ms. Paul along with notes from the meeting were delivered to Mr. Shah and Mr. Cook by Mr. Kumar. Mr. Shah, again, became incensed that Mr. Huesman, a White man, filed a complaint regarding his behavior.

25.     In direct response to Mr. Huesman's complaint to Ms. Paul, Mr. Shah began a series of retaliatory actions against Mr. Huesman. For example, Mr. Huesman would later learn from Google employees with personal knowledge that Mr. Shah blacklisted Mr. Huesman in direct response to his meeting with Ms. Paul. Mr. Shah's blacklisting of Mr. Huesman prevented him from receiving promotions and negatively impacted his compensation.[2]

---

[2]     Blacklisting employees is a misdemeanor. *See* Fla. Stat. Ann. § 448.045. Here, Mr. Shah, among others, are in violation of this Florida statute, and it is Google Cloud's worst kept secret that Google employees are actively maintaining a blacklist in an attempt to have current employees terminated and/or prohibited from promotion. Although Mr. Huesman is

**Mr. Shah Actively Undermines Mr. Huesman's Career**

26.     In addition to the blacklisting, Mr. Shah engaged in a campaign to actively sabotage and undermine Mr. Huesman's performance and reputation. At Deloitte's request, Mr. Walker and Mr. Huesman flew to San Francisco to meet with Manuil Mehta, a Partner at Deloitte, and Mr. Amirtharajan to continue their discussions on creating a cohesive plan forward and to repair the damaged relationship between Google and Deloitte. The plan was to create a proposed strategy and share it with the Google Cloud organization. Mr. Walker and Mr. Huesman did not attempt to hide their meeting, and Mr. Shah, Ms. Paul, Mr. Cook, and Mr. Kumar were informed of the meeting.

27.     Unbeknownst to Mr. Huesman and Mr. Walker, Mr. Shah, Ms. Paul, Mr. Kumar, and Mr. Cook booked a meeting with Mr. Mehta and Mr. Amirtharajan on the same day, at the same location, but prior to Mr. Huesman's and Mr. Walker's pre-scheduled meeting. Since all of these individuals were previously informed that Mr. Walker and Mr. Huesman already had a planned meeting, it was clear that they were attempting to interfere with Mr. Huesman's and Mr. Walker's discussions with Deloitte (at a meeting that Deloitte requested to have solely with Mr. Huesman and Mr.

---

not asserting a civil claim, he includes this to demand that Google put an immediate end to its illegal practices, and to ensure that no further adverse employment actions be taken against current employees.

Walker given Mr. Shah's actions). Notably, although Mr. Shah attended, he did not have a speaking role, as Deloitte had submitted numerous complaints about him. Rather, Mr. Shah and Mr. Cook led the meeting.

28.    Deloitte representatives disclosed that they accepted the meeting out of courtesy, but were disappointed by Mr. Shah's, Mr. Kumar's, Mr. Cook's, and Ms. Paul's attempts to downplay and deflect away from Mr. Shah's documented history of behavior. They further informed Mr. Huesman and Mr. Walker that the meeting did not change Deloitte's position that Google must remove Mr. Shah from further interactions with Deloitte, and that they preferred to work with Mr. Huesman and Mr. Walker leading the relationship.

29.    In April 2022, Mr. Shah began to target associates close with Mr. Huesman. Mr. Shah attempted to discipline Mr. Dittmer and Mr. Walker (but not Mr. Huesman as he was not involved) for divulging Google's internal information with Deloitte, even though the information pertained to the relationship. In fact, while only a small subset of information was sent over to Deloitte, the overall document had already been shared with a number of Google's partners. Thus, there was no issue with the disclosure of the information and the disclosure was done to advance the projects that Deloitte and Google were collaborating on. Instead, Mr. Shah saw an opportunity and began to include Google's human resources to retaliate Mr. Dittmer and Mr. Walker. Moreover, Mr. Shah was angered by the fact that actions were taken

11

to improve the relationship between Deloitte and Google as Mr. Shah continued to take actions to undermine the relationship.

30.     Since it was clear that Mr. Shah was attempting to discriminate against and harass Mr. Dittmer and Mr. Walker, Deloitte was furious when they received these e-mails, as they were copied in the thread. Once again, Mr. Shah's actions, intentionally done in front of Deloitte, irreparably damaged Google's relationship with Deloitte, and it became apparent that Google had no intention of re-assigning Mr. Shah despite the constant complaints by Deloitte and other employees. It is important to note that Deloitte is not the only outside company that has refused to work with Mr. Shah and demanded that he be removed from any interactions. Rather, Google Germany and Google Canada, as well as Google's West Coast Market Unit, have refused to allow Mr. Shah to be involved in their deals due to his unprofessional behavior.

31.     In or around May 2022, given that Ms. Paul failed to take any action (including but not limited to, failing to open an investigation after a complaint was submitted), and clearly sided with Mr. Shah, Mr. Huesman reported Mr. Shah to Anne Heintz, a Senior Employee Relations Partner, as well as to Jay Meissner, the Head of Global Systems Partners. This was not the first time Mr. Huesman complained about Mr. Shah to Mr. Meissner, as the two spoke about Mr. Shah's discriminatory behavior on at least ten prior occasions. In the complaints, Mr. Huesman detailed Mr. Shah's harassment

and discriminatory behavior and stated that Google had tolerated Mr. Shah's unprofessional behavior for too long. Given the numerous complaints that had been filed against Mr. Shah at that point, Mr. Huesman hoped Google would resolve the issue this time.

### Mr. Shah Excludes Mr. Huesman from Key Correspondence

32.     Meanwhile, Mr. Shah's campaign of retaliation continued. Given that Deloitte put Mr. Huesman and Mr. Walker in charge of mending the relationship between Google and Deloitte, Deloitte requested that Mr. Huesman and Mr. Walker spearhead and attend the upcoming Deloitte summit with Google. Despite Deloitte's clear request, both Mr. Huesman and Mr. Walker were left off planning emails and never listed as attendees on internal correspondence. It was around this time that Mr. Huesman was informed by a Google employee with personal knowledge of the situation that Mr. Huesman had been placed on the previously mentioned "blacklist" at Google.

33.     Mr. Shah's retaliation campaign continued to extend to employees beyond Mr. Huesman and Mr. Walker. Stephanie Moran, the Partner Development Manager for Deloitte and friend of Mr. Huesman, became a target for Mr. Shah and Mr. Cook. In planning e-mails regarding the Deloitte summit, Mr. Kumar stated that his team had "honored" Mr. Cook's "point of view on [Mr. Huesman] and [Mr. Walker]" and as a result, neither individual

had been invited to attend or placed on the list of attendees for the summit. While this e-mail makes it clear that the term "blacklist" had been discussed on the call, it was not made in a written medium. In turn, Mr. Cook represented that Ms. Moran should not attend because Ms. Moran had engaged Mr. Huesman in discussions regarding the Deloitte summit. Mr. Cook proceeded to assert that he and his team would threaten to withdraw from attending the Deloitte summit if Ms. Moran or Mr. Huesman were listed as attendees. Mr. Cook also threatened to withdraw his group's funding of the summit, if Mr. Huesman was an attendee.

34.     Ms. Moran, caught in the middle, was unaware of the reason as to why Mr. Shah and Mr. Cook were retaliating against Mr. Huesman. She clarified that Mr. Huesman had never been on the list of proposed Google attendees, and that she had only reached out to Mr. Huesman because he was Google's SAP designated resource on the Deloitte relationship. Ms. Moran's e-mail only further demonstrates the retaliation that Mr. Huesman was subjected to by Mr. Shah and Mr. Cook.

35.     In sum, Mr. Shah and Mr. Cook refused to include Mr. Huesman and Mr. Walker in the planning of the summit, despite Deloitte demanding that Google do so. Mr. Shah and Mr. Cook also refused to allow Mr. Huesman and Mr. Walker to attend the summit, once again, despite Deloitte demanding that Google present them as attendees. Mr. Shah and Mr. Cook's actions were

14

clearly retaliatory because it makes little sense not to include Google's designated SAP and designated resource on the Deloitte relationship in the planning and attendance of the summit.

36.    Mr. Cook's retaliatory behavior stood out to Ms. Moran, and she sent a further conversation to Mr. Cook about his e-mails on August 10, 2022. In her e-mail, Ms. Moran referenced that Mr. Cook was the "one common denominator" as to why there have been five PDM's involved in the SAP issues, and that she felt that she, along with other individuals like Mr. Huesman and Mr. Walker, were being singled out to not attend the Deloitte Summit. Ms. Moran went on to assert her understanding that Mr. Cook was not willing to allow relevant teams to participate in the planning and/or attendance of the summit, and was making misrepresentations to the team.

37.    Ms. Moran's e-mail concluded with questioning why Mr. Cook seemingly had the sole authority to determine which individuals could attend the Deloitte summit, and why other teams and organizations were being prevented from participating. Ms. Moran also questioned why Google enacted a "blacklist" and stated her belief that Mr. Cook's and Mr. Kumar's actions were unacceptable and in violation of Google's policies. Ms. Moran also demanded to be informed why Mr. Huesman, Google's point of contact for the Deloitte relationship, was being actively prohibited from attending by Mr. Cook.

15

38.     Telling, Ms. Moran memorialized the fact that Mr. Cook represented that Mr. Huesman and Mr. Walker were placed on an internal "blacklist" and that was one of the reasons why they were prohibited from attending the summit. This was not the first time that the term "blacklist" was utilized in reference to Mr. Huesman and Mr. Walker, nor would it be the last. Ms. Moran raised the issue as to why "blacklists" were allowed at Google, and subsequently also informed Mr. Voss about Mr. Cook's retaliatory efforts and his usage of a "blacklist" against Mr. Huesman and Mr. Walker. Mr. Voss acknowledged that he had heard the usage of "blacklist" by another Google employee, but disclaimed knowledge of any actual "blacklist." Instead, he assured Ms. Moran that he would look into the situation, and that he would speak to Mr. Huesman as well. Unsurprisingly, there was no subsequent investigation commenced by Mr. Voss, nor did he attempt to speak with Mr. Huesman.

### Mr. Huesman is Forced to Transfer Positions & Resign

39.     During his 2022 year-end performance review, Mr. Huesman's direct supervisor, Mr. Mills, explicitly told Mr. Huesman, "don't expect a company like Google to ever promote a white guy in this culture." Upon hearing this statement, Mr. Huesman felt he had no other option but to file another complaint about the discriminatory treatment he was subjected to.

16

40.    In or around October 2022, Mr. Huesman filed another complaint with Google Human Resources against Mr. Shah, Mr. Cook, and Mr. Mills, along with the new information and examples of discrimination, harassment, and/or retaliation.

41.    Despite it being well known that Mr. Shah has years of well documented behavioral issues and discriminatory and harassing statements, as well as retaliation towards Mr. Huesman, Google simply represented that they were aware of Mr. Shah's behavior, that Mr. Shah was "getting help," and that Mr. Huesman "just needed to deal with it."

42.    Google's "investigation" into Mr. Shah closed without any evidence Google took it seriously. At no point did Google contact a single person Mr. Huesman identified as a witness to Mr. Shah's reprehensible conduct. Google employees Doug Swan, Andy Walker, Sharon Tran, Edy Sardilli, and Stephanie Moran all had personal knowledge of Mr. Shah's behavior, but Google did not contact any of them. Upon conclusion of its "investigation," Google stated there was nothing they could do and closed its investigation.

43.    In or around the end of 2022, Mr. Huesman felt he had no other choice but to transfer to the Google Accenture Business Group to escape the "blacklist" and toxic environment Mr. Shah created.

44.    Despite moving to an entirely separate division of Google and completely away from Mr. Shah, the "blacklist" still hung over Mr. Huesman's

head. While working for Google Accenture, Mr. Huesman could feel his career growth was stunted because his salary was stagnant and he was being passed over for promotions.

45.    Over the next year, Mr. Huesman was forced to tolerate the discrimination, harassment, and retaliation because he did not want to lose the $1 million in Google stock that was close to vesting.

46.    On February 21, 2024, Mr. Huesman reluctantly resigned from Google due to the feeling that his reputation had irreparably damaged by Mr. Shah and his colleagues. Despite numerous complaints, Google refused to put an end to the retaliation that Mr. Huesman was subjected to and remained on Mr. Shah's and his colleagues' "blacklist." Given comments from several supervisors, it was clear that Mr. Huesman had no future at Google because of his race. Mr. Huesman felt as if he had no choice but to seek new employment as he could no longer tolerate the significant decreases in his compensation, false performance reviews, and promotional opportunities denied to him.  No reasonable person should be forced to stay at a company when the company has made it clear that there is no future with the company and the lack of a future was due to the employee's race.

47.    Despite being the subject of at least twenty complaints relating to his discriminatory, harassing, and retaliatory behavior, Google has taken no action against Mr. Shah, not even the slightest reprimand. To this day, Mr.

Shah continues to be protected by Google, and Google has allowed him to continue his unprofessional and illegal behavior.

### **COUNT I: DISCRIMINATION IN VIOLATION OF TITLE VII**

48.    Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as though fully set forth herein.

49.    Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

50.    Mr. Huesman, a White male, belongs to a class of persons protected by Title VII.

51.    At all times relevant, Mr. Huesman was more than qualified for his position, as evidenced by the glowing performance reviews he received prior to filing his complaints against Mr. Shah.

52.    Mr. Huesman suffered several adverse employment actions, including but not limited to, removal of key responsibilities, being left out of key meetings (even where his presence was requested by the client), his authority was intentionally undermined, he was provided lower performance reviews (which resulted in a significant decrease in compensation for 2022 and 2023), and was placed on a "blacklist" which negatively impacted Mr.

Huesman's ability to be promoted, transferred, and earn additional compensation.

53.    Mr. Huesman was specifically targeted by Mr. Shah and other Google employees because he is a White male. Statements from Mr. Shah such as "[Y]ou are White, so don't think you will ever get a promotion or advance" and Mr. Shah's representations that he did not want to have "rich, White guys who drive Mercedes and golf all day" at Google establish Mr. Shah's actions were motivated by a racial animus.

54.    The harassment Mr. Huesman suffered from due to his race left him with no choice but to resign from his position at Google.

55.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has lost substantial income.

56.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has suffered emotional distress, humiliation, great expense, embarrassment, damage to his reputation, damage to his financial credit, pain and suffering, mental anguish, and loss of enjoyment of life.

//

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII

57.    Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as though fully set forth herein.

58.    In addition to prohibiting discrimination based on race in the workplace, Title VII prohibits an employer from taking any retaliatory action against an employee because the employee engaged in statutorily protected activity.

59.    A claim for retaliation under Title VII requires a plaintiff to allege: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action.

60.    Mr. Huesman engaged in protected activity when he filed complaints about Mr. Shah's harassing and discriminatory behavior in January, May, and October 2022.

61.    Soon after his complaint, Mr. Huesman suffered several adverse employment actions, including but not limited to, removal of key responsibilities, being left out of key meetings (even where his presence was requested by the client), his authority was intentionally undermined, he was provided lower performance reviews (which resulted in a significant decrease in compensation for 2022 and 2023), and was placed on a "blacklist" which

21

negatively impacted Mr. Huesman's ability to be promoted, transferred, and earn additional compensation.

62.    Mr. Huesman's opposition to discriminatory practices was the sole or motivating factor which contributed to the discriminatory treatment in the terms and conditions of Mr. Huesman's employment with Google.

63.    From at least January 2022 and until Mr. Huesman's departure in February 2024, Google was aware of the retaliatory actions taken by Mr. Shah against Mr. Huesman, but did nothing to address such actions.

64.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has lost substantial income.

65.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has suffered emotional distress, humiliation, great expense, embarrassment, damage to his reputation, damage to his financial credit, pain and suffering, mental anguish, and loss of enjoyment of life.

    //

## COUNT III: RACE BASED HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

66.     Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as though fully set forth herein.

67.     Mr. Huesman, a White male, belongs to a class of persons protected by the Florida Civil Rights Act.

68.     As stated herein, Mr. Huesman was discriminated against and harassed because of his race. Because of this protected class, Mr. Huesman suffered different compensation, terms, conditions, and privileges of employment, especially given that Google, through Mr. Shah and others, refused to promote him because of Mr. Huesman's protected classes.

69.     Additionally, Mr. Huesman was the victim of a hostile work environment created by Google and its employees, as he was subjected to a number of discriminatory and harassing comments based on his race. Despite multiple complaints from Mr. Huesman and other Google employees, Google only offered mere platitudes but took no effort to remedy the hostile work environment that was present at Google.

70.     Rather, Google ratified and approved of its employees discriminatory and harassing behavior. Google was well aware of the complaints that Mr. Huesman had filed, and it was even perpetrated by senior leadership.

23

71.    The conduct and behavior of Google, and its agents, representatives, and employees substantially interfered with Mr. Huesman's employment and created an intimidating, hostile, and offensive work environment.

72.    Google's conduct further violated Title VII in that it failed to provide Mr. Huesman with employment conditions and relationships where he could safely work, free from harassment because of his race, and because it failed to promptly respond to Mr. Huesman's complaints of discrimination and/or harassment.

73.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman suffered emotional distress, humiliation, great expense, embarrassment, damage to his reputation, damage to his financial credit, pain and suffering, mental anguish and loss of enjoyment of life.

74.    As a further direct and proximate result of said unlawful employment practices, Mr. Huesman has suffered the indignity of discrimination and harassment and invasion of his right to be free from discrimination and humiliation, which has manifested in emotional distress.

75.    As a further direct and proximate cause of said unlawful employment practices, Mr. Huesman has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself,

24

harm to his employability and earning capacity, painful embarrassment among his friends and coworkers, damage to his good reputation, disruption to his personal life and loss of enjoyment of the ordinary pleasures of everyday life.

## COUNT IV: DISCRIMINATION IN VIOLATION OF THE FCRA

76.    Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as though fully set forth herein.

77.    The Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA") makes it illegal for an employer to: discharge or to fail or refuse to hire any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status. Further, it is also illegal for an employer to limit, segregate, or classify employees in any way which would deprive or tend to deprive any individual or employment opportunities.

78.    Mr. Huesman, a White male, belongs to a class of persons protected by the Florida Civil Rights Act.

79.    As stated herein, Mr. Huesman was discriminated against and harassed because of his race. Because of this protected class, Mr. Huesman suffered different compensation, terms, conditions, and privileges of

employment, especially given that Google, through Mr. Shah and others, refused to promote Mr. Huesman because of his race.

80.    Google's conduct violated § 76.01 *et seq*. in that it failed to provide Mr. Huesman with employment conditions and relationships where he could safely work, free from harassment because of his race, because it failed to promptly respond to Mr. Huesman's complaints of discrimination and/or harassment, and because it failed to thoroughly investigate Mr. Huesman's complaints or discrimination and/or harassment.

81.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has lost substantial income.

82.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has suffered emotional distress, humiliation, great expense, embarrassment, damage to his reputation, damage to his financial credit, pain and suffering, mental anguish, and loss of enjoyment of life.

83.    Google's acts of discrimination and harassment were performed with malice and/or reckless indifference to Mr. Huesman's protected civil rights. Section 760.11(5) provides that punitive damages may be awarded.

//

26

## COUNT V: RETALIATION IN VIOLATION OF THE FCRA

84.    Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as fully set forth herein.

85.    Section 760.10(7) states, "it is an unlawful employment practice for an employer . . . to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has testified, assisted or participated in any manner in an investigation . . . under this section."

86.    Here, Mr. Huesman opposed the discriminatory practices and harassment that he was subjected to. He reported Mr. Shah's discriminatory behavior to Google on three separate occasions in January, May, and October 2022. Shortly after he engaged in protected activity by making a report of discrimination and harassment, Mr. Huesman was retaliated against, placed on an internal "blacklist" at Google, and subject to further discrimination because he had created the reports.

87.    Mr. Huesman's opposition to discriminatory practices was the sole or motivating factor which contributed to the discriminatory treatment in terms and conditions of Mr. Huesman's employment with Google.

88.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman has lost substantial income.

89.    Google's acts of retaliation were performed with malice and/or reckless indifference to Mr. Huesman's protected civil rights. Section 760.11(5) provides that punitive damages may be awarded.

## COUNT VI: HOSTILE WORK ENVIRONMENT BASED ON RACE IN VIOLATION OF THE FCRA

90.    Mr. Huesman realleges and incorporates by reference paragraphs 1–47 as though fully set forth herein.

91.    Mr. Huesman, a White male, belongs to a class of persons protected by the Florida Civil Rights Act.

92.    As stated herein, Mr. Huesman was discriminated against and harassed because of his race. Because of this protected class, Mr. Huesman suffered different compensation, terms, conditions, and privileges of employment, especially given that Google, through Mr. Shah and others, refused to promote him because of Mr. Huesman's protected classes.

93.    Additionally, Mr. Huesman was the victim of a hostile work environment created by Google and its employees, as he was subjected to a number of discriminatory and harassing comments based on his race, Despite multiple complaints from Mr. Huesman and other Google employees, Google

only offered mere platitudes but took no effort to remedy the hostile work environment that was present at Google.

94.    Rather, Google ratified and approved of its employees discriminatory and harassing behavior. Google was well aware of the complaints that Mr. Huesman had filed, and it was even perpetrated by senior leadership.

95.    The conduct and behavior of Google, and its agents, representatives, and employees substantially interfered with Mr. Huesman's employment and created an intimidating, hostile, and offensive work environment.

96.    Google's conduct further violated the FCRA in that it failed to provide Mr. Huesman with employment conditions and relationships where he could safely work, free from harassment because of his race, and because it failed to promptly respond to Mr. Huesman's complaints of discrimination and/or harassment.

97.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Mr. Huesman's rights, Mr. Huesman suffered emotional distress, humiliation, great expense, embarrassment, damage to his reputation, damage to his financial credit, pain and suffering, mental anguish and loss of enjoyment of life.

98.    As a further direct and proximate result of said unlawful employment practices, Mr. Huesman has suffered the indignity of discrimination and harassment and invasion of his right to be free from discrimination and humiliation, which has manifested in emotional distress.

99.    As a further direct and proximate cause of said unlawful employment practices, Mr. Huesman has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself, harm to his employability and earning capacity, painful embarrassment among his friends and coworkers, damage to his good reputation, disruption to his personal life and loss of enjoyment of the ordinary pleasures of everyday life.

100.    Google's acts of discrimination and harassment were performed with malice and/or reckless indifference to Mr. Huesman's protected civil rights. Section 760.11(5) provides that punitive damages may be awarded.

## **JURY TRIAL DEMAND**

101.    Mr. Huesman demands a jury trial on all counts so triable.

*//*

## **PRAYER FOR RELIEF**

Mr. Huesman prays this Court:

i.      Enters judgment in his favor and against Defendant Google;

ii.     Awards compensatory damages including, but not limited to, back pay and lost wages against Defendant Google;

iii.    Awards non-economic and punitive damages against Defendant Google;

iv.     Award Mr. Huesman his reasonable attorney's fees pursuant to sections 42 U.S.C. § 2000e-5(k) and § 760.11(5), Fla. Stat. and his taxable costs;

v.      Remove him from any blacklist and/or enjoin Google from further keeping or using any such blacklisting of employees or former employees; and

vi.     Award any further relief the Court deems appropriate.

Respectfully submitted,

*Matt Sarelson*

Matthew Seth Sarelson
Florida Bar 888281
Zachary Stoner
Florida Bar 1032816
**DHILLON LAW GROUP INC.**
Attorneys for Plaintiff
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
305.773.1952
msarelson@dhillonlaw.com
zstoner@dhillonlaw.com

31